**MADIGAN, INCORPORATED, et al., Plaintiffs-Appellants,**

v.

**Gilbert GOODMAN et al., Defendants-Appellees.**

**No. 73-1628.**

United States Court of Appeals, Seventh Circuit.

Heard Feb. 28, 1974.

Decided June 6, 1974.

---

Fred H. Bartlit, Jr. and Frank Cicero, Jr., Kirkland & Ellis, Chicago, Ill., for plaintiffs-appellants.

Joseph P. Della Maria, Jr., Michael J. Guinan, Sheldon Karon, Russell J. Topper, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, CUMMINGS and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

Four corporate plaintiffs and five of their directors, collectively known as the Madigan Group, sued seven former shareholders of Fidelity General Insurance Company and the receiver of Dealers National Insurance Company and Liberty Universal Insurance Company, who held title to 1,071,650 shares of Fidelity's common stock. The complaint asserted that defendants made false representations concerning Fidelity's financial situation to the detriment of the Madigan Group. The amended complaint makes clear that the defendant receiver is not charged with fraud and is joined only to insure the enforceability of any relief affecting title to the Fidelity shares. Count I of the complaint was based on the Securities Exchange Act of 1934 (15 U.S.C. § 78a, et seq.) and SEC Rule 10b–5 (17 C.F.R. § 240.10b–5). Count II was based on Illinois common law fraud. After considering plaintiffs' answers to defendants' interrogatories, the district court rendered an opinion dismissing the complaint. 357 F.Supp. 1331 (N.D.Ill.1973).

Because of the court's reliance on those answers, its ruling was actually a summary judgment for defendants. Rule 12(b) of the Federal Rules of Civil Procedure. Plaintiffs' subsequent motion for leave to file an appended amended complaint was denied. We will consider the allegations of the amended complaint, since its filing should have been permitted. See Austin v. House of Vision, Inc., 385 F.2d 171, 172 (7th Cir. 1967).

According to the complaint, the Madigan Group purchased 51% of the common stock of Fidelity from defendants for $1,750,895.50 in December 1968. At the same time, the Madigan Group contracted to make a tender offer for the remaining Fidelity shares before June 30, 1969. In September 1969, the Madigan Group sold its Fidelity stock to Texas Consumer Finance Corporation for $1,750,895. Texas Consumer Finance Corporation was an affiliate of the Madigan Group. It and two other affiliates assumed the obligation to make the tender offer and purchased 506,845 shares of Fidelity from various sellers for $1,571,219.50 in the summer of 1969. None of these three companies are parties to this lawsuit.

The complaint asserted that as a result of defendants' understatement of the reserves for losses and loss adjustment expenses of Fidelity, plaintiffs expended $3,322,115 to buy Fidelity stock; expended additional sums in an effort to prevent the insolvency of Fidelity; lost $1,000,000 in expected profits; incurred substantial expenses in defending lawsuits resulting from their purchase of Fidelity stock; might incur substantial losses (possibly exceeding $48,000,000 according to the opinion below) in connection with Fidelity-related litigation; and were unable to plan and conduct their financial affairs in an orderly manner due to the same litigation.

In its opinion, as noted, the district court relied on the Madigan Group's answers to defendants' interrogatories. These answers claimed that Fidelity was insolvent in 1968 and that in November and December of that year defendants

orally and in writing falsely represented its financial condition, "including its reserve for losses and loss expenses." The answers also asserted that subsequent to December 31, 1968, defendants submitted under oath a 1968 Fidelity annual statement to the Illinois Director of Insurance that falsely represented its financial condition. Assertedly thereafter, defendants "caused revisions to be made to the 1968 Fidelity general annual statement and offered false explanations for the revisions while concealing the true reasons for the revisions." Defendants supposedly continued to conceal Fidelity's true financial condition by "concealing from the plaintiffs actions that had been taken by several state insurance regulatory bodies because of the financial condition of Fidelity * * *." The answers also state that the Illinois Department of Insurance concluded subsequent to Fidelity's liquidation that it "would have been insolvent as of December, 1968 had its financial condition been accurately reported then." September 1969 was stated to be the first time that plaintiffs became aware that defendants had misrepresented Fidelity's financial condition. To prevent Fidelity's insolvency, plaintiffs allegedly contributed $500,000 to Fidelity's capital on April 30, 1970, but nevertheless on December 4, 1970, the Circuit Court for Sangamon County, Illinois, found Fidelity to be insolvent and ordered that it be placed in liquidation.

According to the supplemental interrogatory answers filed by plaintiffs,

"The information concerning the true financial condition of Fidelity General concealed by defendants could have been ascertained only by an exhaustive study of Fidelity's books and records including all of its claims files and its records relating to loss reserves which was unnecessary in view of the legal duty of defendants not to conceal such information and not to misrepresent the true condition of Fidelity General."

The supplemental answers also state that a partial audit of Fidelity's reserves for losses conducted in September 1969 by the accounting firm of Lybrand, Ross Bros. & Montgomery "indicated deficiencies." In the supplemental answers, plaintiffs also stated that among the losses incurred in attempting to prevent the insolvency of Fidelity was $2,053,-629 "ceded by Fidelity General to Dealers National Insurance Company during 1969, while Dealers National was virtually a wholly owned subsidiary of Madigan."

The district court held that since the plaintiffs resold the Fidelity securities purchased from the defendants for the same price at which those securities were acquired, they suffered no loss. In their supplemental answer to defendants' interrogatory 31(a) and in their proposed amended complaint, plaintiffs no longer claim damages based on loss of purchase price. The court reasoned that in such circumstances plaintiffs had no cause of action based on any violation of the Securities Exchange Act of 1934 or SEC Rule 10b–5.

The court held that the Madigan Group could not recover the $18,384 commission that it had paid to a broker in connection with its December 1968 purchase of Fidelity securities, stating:

"In fact, under the 'out of pocket rule' the plaintiff Madigan [Group] sold the [Fidelity] stock for what it purchased it for and thus was not damaged. Chasins v. Smith Barney & Co., 438 F.2d 1167 (2nd Cir. 1970)."

It may be noted that *Chasins* does not discuss recoverability of commissions as an element of damages in a securities fraud case.

The district court also held that defendants' liability "does not include the speculative fruits of unrealized profit," so that plaintiffs were not permitted to recover the million dollars they claimed in expected profits and benefits.

As to expenses undertaken by plaintiffs to prevent Fidelity's insolvency, citing Mott v. Tri-Continental Financial Corp., 330 F.2d 468 (2d Cir. 1964), the court held that since such "indirect in-

juries" related to matters after they sold their stock, there could be no recovery under the Securities Exchange Act. *Mott* is no bar to relief here, for Mott sought only recission, despite the fact that he no longer owned the securities. He alleged no substantial damages apart from the securities purchase price that he had recouped nor did he invoke Rule 10b–5.

The court applied the same reasoning to expenses incurred by plaintiffs in defending lawsuits resulting from their purchase of securities from the defendants, and to plaintiffs' claim for damages due to their inability to plan and conduct financial affairs as a result of said lawsuits. The court also held that these damages were not attributable to defendants.

The court also indicated its view that the five individual plaintiffs and two of the four corporate plaintiffs (Ward Cut-Rate Drug Company and Mading-Dugan Drugstores, Inc.) had neither purchased nor sold Fidelity stock and therefore had no standing to assert a claim under Rule 10b–5, citing Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), and Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970). As a result of this finding, in the proposed amended complaint "only those plaintiffs who purchased Fidelity General stock seek recovery of damages [apparently as opposed to indemnification or contribution] caused by defendants' security fraud" (plaintiffs' reply brief 6, n. 3). In view of this construction of the amended complaint, we will not consider the effect of Eason v. General Motors Acceptance Corp., 490 F.2d 654 (7th Cir. 1973), on the standing question. The district court did not consider the Illinois common law fraud count, nor have the parties briefed that question in this Court. Therefore, we will not consider it either.

On appeal, the Madigan Group first argues that its members are entitled to indemnification or contribution from defendants for any liability to which plaintiffs may be exposed in the pending action filed against them by the Illinois Director of Insurance as liquidator of Fidelity. That suit, Mauck v. Mading-Dugan Drug Co. et al., No. 70 C 2151, is still pending before the same district judge. The defendants include the five individual plaintiffs herein. $16,500,000 in damages are sought in addition to equitable relief.

The liquidator's complaint states a quite different version of the facts. He alleges that Fidelity was solvent when purchased by the Madigan Group, and that the Madigan Group promptly diverted all the assets of Fidelity into other Madigan Group companies, leaving Fidelity a "corporate shell." Fidelity, Texas Consumer Finance Corporation, and other companies rendered insolvent by the scheme were then abandoned by the Madigan Group, according to the liquidator. The Madigan Group complaint describes a number of transactions which it says were designed to save Fidelity by transferring more liquid or more valuable resources to it than it paid in exchange; the liquidator's complaint describes those same transactions as part of the scheme to loot Fidelity, giving it worthless assets in return. Before dismissing the present case the district judge consolidated the two suits, stating:

> "The main issue to be resolved in both cases is what caused the liquidation of Fidelity General, *i. e.*, was it the bootstrap acquisition by Mading-Dugan or the already existing insolvency of Fidelity General compounded by false and misleading financial statements."

█ We hold that if the suits proceed on the theories of the present complaints, the Madigan Group is entitled to neither indemnity nor contribution. If the Madigan Group is correct that the damage alleged in these cases flows from Fidelity's pre-existing insolvency and the concealment thereof, then the liquidator will be unable to prove his complaint, and there will be no judgment against the Madigan Group to contribute to or indemnify. Conversely, if the liquidator does prove his complaint and wins a judgment against the Madigan Group, then the Madigan Group's view of the

facts will necessarily have been disproven. What the Madigan Group really seeks is a second chance to litigate the issues in the event they are unsuccessful in the liquidator's suit. This is not the purpose of indemnification or contribution, as an examination of the cases relied on by the Madigan Group makes clear. In both of those cases, a defendant sought indemnity from a third party defendant, relying on the same facts alleged by plaintiff plus an allegation that the third party defendant had caused defendant to commit an unwitting violation of the securities laws. See deHaas v. Empire Petroleum Co., 286 F.Supp. 809, 815–816 (D.Col.1968), decision on plaintiffs' complaint affirmed, 435 F.2d 1223 (10th Cir. 1970); Handel-Maatschappij H. Albert De Bary & Co. N. V. v. Faradyne Electronics Corp., 37 F.R.D. 357 (S.D.N.Y.1961).

However, since the plaintiffs in the liquidator's suit may conceivably amend their complaint at a time when a new complaint for indemnity and contribution might pose unresolved statute of limitations issues, it seems inappropriate to dismiss this aspect of the complaint entirely. The facts shown at trial might not be consistent with any of the complaints, and an indemnity or contribution situation could emerge. If, for example, the Madigan Group is held liable for selling Fidelity General stock, and in connection with that sale, repeating the false representations which it alleges were made to it, then it might be entitled to indemnity or contribution from the source of the misrepresentations. There is no need to decide such hypotheticals until they arise. The controlling principle is that the Madigan Group cannot seek indemnity or contribution on a theory inconsistent with the theory on which it is held liable. If the Madigan Group plaintiffs are too culpable to be entitled to indemnification, they may nonetheless be entitled to contribution. See deHaas, *supra*; Globus, Inc. v. Law Research Service, Inc., 318 F.Supp. 955, 958 (S.D.N.Y.1970), affirmed *per curiam*, 442 F.2d 1346 (2d Cir. 1971), certi-

orari denied *sub nom.* Law Research Service, Inc. v. Blair & Co., 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 254.

Plaintiffs next contend that they are entitled to recover the following consequential damages:

1. Contributing additional capital to Fidelity and incurring other expenses in an attempt to avoid its insolvency.

2. Loss of $18,384 broker's commission or finder's fee in connection with acquisition of Fidelity stock.

3. Causing a significant amount of Fidelity's losses to be reinsured by Dealers National Insurance Company, resulting in the Madigan Group's absorption of losses from reinsurance amounting to $2,-053,629.

4. Divestment of ownership in Fidelity and other insurance operations at a loss of $7,000,000.

5. Litigation expenses for defending related lawsuits.

6. Damages for inability adequately to plan and orderly to conduct their financial affairs as a result of these other lawsuits.

7. A one million dollar loss of profits and other benefits reasonably expected.

Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795 (2d Cir. 1973), certiorari denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146, holds that buyers defrauded under the Securities Exchange Act are entitled to consequential damages. See also deHaas v. Empire Petroleum Co., 435 F.2d 1223, 1228–1229 (10th Cir. 1970). We agree that if plaintiffs can establish the requisite causal nexus at trial, they are entitled to recover out-of-pocket consequential damages suffered as a result of holding Fidelity stock. We reject the contention that consequential damages are recoverable only if incurred while the stock was held. When a securities transaction causes plaintiffs to wind up with less money than they began with, there is no reason in the policy of the securities laws why their right to recovery should depend on exactly when the loss was realized or on whether the loss was fully

reflected in a change in the securities' price.

Accordingly, capital contributions and other expenses of attempting to save Fidelity may be recoverable. Plaintiffs must show that each expenditure for which recovery is sought was a reasonable effort to, *e. g.*, minimize plaintiffs' losses, or fulfill a fiduciary obligation to Fidelity policyholders, or comply with the requirements of regulatory agencies. They must also show that the danger from which Fidelity was being saved was the pre-existing insolvency concealed by defendants, and that but for defendants' misrepresentations, plaintiffs would not have made these expenditures. We also think that the $18,384 broker's commission or finder's fee is recoverable, if but for the misrepresentation it would not have been spent.

■ Losses on claims reinsured by Dealers National Insurance Company would be recoverable if the test we have set forth for contributions to capital was met, and if these losses were attributable to a plaintiff. However, Dealers is not a plaintiff, and it appears from the interrogatory answers that the plaintiffs' only claim to these losses is that Dealers was a subsidiary of one of the plaintiffs. This is not sufficient. We have referred to plaintiffs as the Madigan Group primarily for convenience. The term does not imply that the group collectively is entitled to damages. Each plaintiff is entitled only to its own losses in its individual capacity. Under the circumstances, one corporation may be able to show that it was reasonable for it to spend money to help another, and if the expenditure is otherwise compensable, the corporation which actually spent the money may recover. But no plaintiff may recover simply because it was a shareholder of a corporation which suffered damages, even if the damage was reflected in the value of the stock. It follows that the claim of losses from divestment of other insurance operations cannot be recovered either. Shareholders may enforce corporate rights only if all the conditions for a derivative suit are met; no derivative claims are alleged here.

■ We also hold that expenses from related litigation and damages from inability to plan as a result of that litigation are not recoverable. These damages are not a direct consequence of defendants' alleged fraud. Taking the complaint as true, these damages are a result of the liquidator's gross misperception of what actually happened. Defendants could not have foreseen that a third party would blame their fraud on the plaintiffs. See Smith v. Bolles, 132 U.S. 125, 130, 10 S.Ct. 39, 33 L.Ed. 279. Put another way, the chain of causation has been broken by the independent act of the liquidator.

■ We come finally to the matter of profits and other benefits expected but not earned. There is no allegation that defendants made windfall profits which must be disgorged; in that situation, plaintiffs' disappointed expectations might be relevant as one possible formula for allocating the disgorged profits among the various plaintiffs. The question presented is simply whether a defrauded buyer is entitled to the benefit of his bargain.

The federal rule has traditionally been that only "out of pocket" losses are recoverable in a fraud action. Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10th Cir. 1962). A defendant "was bound to make good the loss sustained, such as the moneys the plaintiff had paid out and interest, and any other outlay legitimately attributable to defendant's fraudulent conduct; but this liability did not include the expected fruits of an unrealized speculation." Smith v. Bolles, 132 U.S. 125, 129–130; see also Levine v. Seilon, Inc., 439 F.2d 328, 334 (2d Cir. 1971).

We adhere to this rule. Plaintiffs have not alleged a breach of contract; they complain of a misrepresentation. If defendants had told the truth, plaintiffs would have no complaint. Neither would they have had a million dollars in expect-

ed profits on a 1¾ million dollar investment. The consequence of defendants' acting legally would have been that plaintiffs would not have purchased, or would have purchased at a lower price. Plaintiffs are entitled to compensation for lost alternative uses of their money, but defendants' fraud did not obligate them to create profits that never existed and, under the alleged circumstances, never could have existed.

Even lost alternative investments are not literally "out of pocket" expenses, but that shorthand phrase should not obscure proper analysis. Smith v. Bolles, *supra*, apparently the first case to announce the federal rule, allowed interest on the purchase price. Had plaintiffs not purchased the Fidelity stock, or purchased at a lower price, they would have put the unused money somewhere, even if only in a savings account. Unlike the non-existent profits envisioned as a result of defendants' misrepresentations, the chance to use their money elsewhere was actually lost to plaintiffs. But we agree with *Zeller, supra*, that if plaintiffs seek more than the market rate of interest, they must prove with a "good deal of certainty" that they would have made a particular alternative investment that would have produced a higher return than market interest. 476 F.2d at 803.

 Neither the complaint nor the amended complaint sought interest on the purchase price for the time the money was tied up, but plaintiffs did request $100,000 for this item at oral argument. It follows from what we have said that plaintiffs are entitled to amend their complaint to claim interest on the remand.

The defendant receiver's motion to affirm without oral argument was denied on January 22, 1974. He should remain a party to this action until the district court decides upon the exact type of relief, if any, to be awarded.

We affirm the order of the district court insofar as it holds that plaintiffs are not entitled to damages based on: loss of purchase price, expenses of other litigation, inability to plan and conduct their financial affairs and loss of profits and other expected benefits (at least in the absence of a trial showing of defendants' windfall profit). They are also not entitled to divestment damages as prayed in the amended complaint. We reverse the order insofar as it denies plaintiffs the opportunity to prove their right to indemnity or contribution, or direct consequential damages, including the broker's commission or finder's fee and costs of attempting to save Fidelity, and we remand the cause for further proceedings consistent with this opinion, with directions to grant plaintiffs leave to file their proposed amended complaint.